IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Amres corporation**<br>**Plaintiff(s),**<br><br>       v.<br>Vista Point<br>Mortgage LLC<br>**Defendant** | CIVIL ACTION<br><br>Case No. |

**COMPLAINT IN LAW AND EQUITY WITH INJUNCTIVE RELIEF REQUESTED**

### PARTIES

1. Plaintiff, Amres Corporation, ("Amres") is the is a Pennsylvania Corporation with headquarters at 1 Neshaminy Interplex Dr Suite 310, Feasterville-Trevose, PA 19053.

2. Amres is a prime mortgage lender, for wide array of residential and business mortgage products, and in business since 2015, however Amres is not in the business of servicing the loans, which it sells to investors like the Defendant Vista Point Trust I referred to below.

3. Vista Point Trust I ("VPT") is a purchaser of mortgage loans. Vista Point Mortgage, LLC ("VPM") is the administrator for VPT and the sole beneficiary of VPT.

4. Vista Point Mortgage, LLC, a Delaware LLC, with headquarters in 1920 Main St # 200, Irvine, CA 92614.

### JURISDICTION and VENUE

5. This Court's jurisdiction arises under diversity jurisdiction, 28 U.S. Code § 1332, as there is total diversity between parties, and amount in controversy exceeds $75,000, as set forth below.

6. The venue is appropriate in E.D. of PA, as Plaintiff is located in Bucks co. within geographic boundaries of the Court.

## STATEMENT OF THE CLAIMS

7. VPM entered into a Purchase and Sale Agreement ("LPSA") with correspondent lender Amres Corporation ("Amres"), pursuant to which Amres would sell loans to VPM once they closed.

8. In due course, on or around January 2023, VPM asserted that there were damages which it incurred by virtue of certain conditions and alleged fallacies on the loans Amres sold them, and did not rescind the transaction (buyback or buyback demand), resulting in alleged balance due to VPM.

9. By May of 2023, the parties engaged in good faith negotiations on how to best resolve the issues, pertaining to alleged balance Amres had with VPM.

10. In scope of these negotiations, on how to resolve and settle the balance, on May 4th 2023, VMP demanded that Amres provide the following, otherwise confidential information, or "matter would be referred to legal":

    b) **Year-end audited Financials;**

    c) **Year to date Financials;**

    d) **Current [Amres], pipeline-[with VPM]**

    **See Exhibit A**

11. After consultation with the CEO of Amres, and in effort to settle the debt, acting in good faith, Amres complied and its Chief Financial Officer, provided detailed, otherwise

confidential financials requested, in order to avoid matter escalating into a legal dispute. **See Exhibit B.**

12. Further negotiations between parties resulted in an agreement by which on May 18th 2023, Amres CEO, confirmed in writing agreeing to resolve the balance alleged, by Amres continuing to sell loans to VPM, but under a condition that allowed VPM to retain 50base pts in excess of actual sale price, on each loan, withheld by VPM, towards repayment of the alleged debt, exactly as VPM admits in its Arbitration papers.

13. Both parties consummated such agreement, and VPM appeared happy to continue to do business with Amres, being allowed to collect 50base pts in excess each and every loan sale price Amres would sell to VPM. Attached hereto is a non-exclusive sample list of such loans **See Ex C.**

14. On August 14th 2023 VPM's Main Counsel issued a Make Whole Demand, of $ 177,263. which Demand, notably did not contain a pay off date, even though it states that the "*Target Payoff Date was included in instructions*", no such payoff date is found in his instructions, or in the LPMW. ***See* Ex. D.**

15. Lack of a payoff date, was understood by Amres, as a clear recognition and ratification of payment plan agreement, of ongoing payback over time, as parties had been doing. Id.

16. In due course of fulfillment of the payback obligation, Amres never refused to allow Vista to retain 50pts points, and did not otherwise breach the agreement.

17. Nevertheless, on or around March 22nd of 2024 VPM, filed a Demand for Arbitration against Amres, inserting total debt alleged, and inserting additional 2 loans, as problematic and default items, despite not adhering to opportunity for Amres to cure, (30 days to cure) which is guaranteed by LPSA . See **Exhibit E.**

18. Further, the subject loans were sold in mitigation efforts, at a loss, in apparent effort to manufacture a non-existent losses, by engaging in mitigation before matter was ripe to be mitigated and or before any loss could even be shown.

19. **In its Arbitration demand complaint, VPM, concedes existence of** three (3), versions of the LPSA, two of which governed purchases of loans by VPM sold by Amres (dated 3/16/21, 6/21/22, and 11/21/23). Id. Underlying LPS Agreements are contained within Ex. E.

20. VPM also alleges that there are provisions found in all three of the underlying LPSAs, that provide for opportunity of the Seller (Amres), 30 days to cure and address condition(s) that caused the buyback demand. Id.

21. All of the LPSAs contain arbitration provisions conferring jurisdiction upon JAMS in Orange County, California (see par. 7.1 for the 2021 and 2022 agreements). The relevant LPSAs (3/16/21 and 6/21/22) are attached as Exhibit A. Id.

22. In its demand for Damages VPM concedes that it retained a set off amount in excess of $53,000, as follows:

> 15. *VPT has been damaged in the amount of $508,107.84 based upon Amres's failure to honor its obligations under the LPSAs as set forth more fully above. As an offset against the above amount owed, however, VPT has retained $53,248.71 in premiums from loans purchased from Amres as allowed by the LPSA, thereby reducing the obligation due and owing from Amres to $454,859.13*
>
> Ex. E.

23. Notably, VPM states that setoff is "allowed by LPSA" and states that there are as many as three (3) versions of it, but does not state which of the three LPSA versions, allegedly allowed such withholding, much less does not state which section of LPSA allows it.

24. Attached LPS Agreements would reveal that no section of any of the three versions of these agreements, provides for for the type of tailor made deal that was made: for Amres to continue to sell prime mortgage loans to VPM, allowing VPM to withhold additional 50pts above agreed above par, continue to provide up to date financials, and VPM would not commence legal action, against Amres.

25. The "setoff" according to Amres, is actually a result of the payment plan/settlement payments Amres was induced to make, under the agreement Amres is seeking to enforce.

25. Prior to both parties adhering to the settlement agreement in Amres allowing VPM to retain in excess of $53,000. on account of alleged balance due, Amres CEO formally confirmed that he that payment agreement to that effect was already in place in an e mail dated Nov 6th 2023., attached as **Exhibit F, p2**.

26. VPM never denied or refuted the written, stated position by Amres CEO, that he considered agreement on payback was already in place, in any subsequent correspondence, $53,248.71, and breach of that agreement is not within either of the LPSA's but a breach of a promise.

## COUNT I – BREACH OF SETTLEMENT AGREEMENT

27. The settlement agreement to which parties adhered to for over 8 month period, had following dickered terms: In exchange for Amres providing VPM its confidential financials, on recurring basis, and continuing to send business (prime mortgage loans), to sell to VPM, while allowing VPM to retain 50pts above the sale price on each loan sold, until paid off, VPN would refrain from suing Amres for the balance.

28. Amres had a strong interest in avoiding costly JAMS arbitration as a defendant, in a remote jurisdiction and conducted under California law, the avoidance of which was the benefit of the bargain to Amres. e Ex. E.

29. VPM breached that agreement when it filed a demand for arbitration on March 22nd 2024.

30. Amres sustained and continues to sustain damages as a result of VPM initiated JAMS arbitration in California in excess of $75,000.

31. As a direct and proximate result, Amres suffered real, and concrete injury, and that injury is comprised of : a) $53,248.71, that was paid as offset to alleged debt; b) opportunity cost and interest on the same amount over at least 12 months; c) legal costs incurred by JAMS arbitration fees (in excess of $30,000 as of the date of filing of this action); d) legal fees of VPN's counsel pursuant to the LPMS (bills at over $500 per hr; e) its own legal fees; f) Amres CEO's man hours expanded in dealing with ongoing JAMS arbitration including discovery, etc.;g) aggravation, embarrassment and reputational harm;

## COUNT II-PROMISORRY ESTOPPEL

32. Amers alleges all previous counts as if fully stated herein.

33. The doctrine of promissory estoppel is invoked to avoid injustice in lieu of the agreement, by making enforceable a promise made by one party to the other when the promisee relies on the promise and therefore changes his position to his own detriment. RESTATEMENT (SECOND) CONTRACTS § 90; *see,* e.g., Shoemaker v. Commonwealth Bank, 700 A.2d 1003, 1006 (Pa.Super.1997)

34. In providing confidential financials to VPM, when requested, and agreeing to allow VPM to retain cash it would otherwise not be otherwise privy to, (in excess of $53,000), Amres relied on VPM promise it would not refer the matter to legal, which reasonably meant that it would not take legal action (initiate JAMS Arbitration proceedings against Amres), for the same debt.

35. Amres reliance was to its detriment as despite doing all that VPM asked, VPM reneged on its promise not to refer matter to legal, and initiate Arbitration (JAMS), after Amres rendered both the cash in excess of $53,000, as well as the financials, as it could have taken other, more beneficial action with its cash, and kept their financials confidential, rather than exposing them to a third party constituent in the industry, one which is clearly adverse to Amres.

36. Amres would not have provided the confidential and detailed financials, or paid cash in excess of $53,000, but for LPM's promise that it would keep status quo, and not sue.

37. It would not be just under the circumstances for VPM to be allowed to break its promise, and justice would seem to require that VPM is held to its work and withdraw its very costly JAMS Arbitration, allowing Amres to continue to pay off the alleged debt in the same manner that parties have consummated over a period of over 6 months prior to VPN filing initiating legal proceedings.

38. As a direct and proximate cause of the VPM's reneging, Amres has suffered real, concrete and particularized harm, ascertained in the damages that are set forth in ¶ 29 above.

39. Amres prays for damages and injunctive relief in an Order halting and dissolving the arbitration proceeds initiated in breach of ongoing payment plan agreement, and or contrary to the reasonably relied upon promise.

## PRAYOR FOR INJUNCTIVE RELIEF

40. In each case, where Injunction is requested, the Courts must balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard to the public consequences. Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91.

41. Amres, submits, that it is likely to prevail on the merits of at least one of the two claims at bar, as it has plead largely irrefutable facts which plainly satisfy each of the elements of the two causes of action brought.

42. Since the onset of JAMS arbitration proceedings, Amres has been attempting to ameliorate the effects and mitigate its damages, seeking to get extension or somehow appease VPN, including offering to resume the deal that was in place, to no avail, as the final hearing is set for beginning June of 2025.

43.. Imminent and irreparable harm will be suffered by AMRES is it was to be subject to JAMS proceedings, in that: 1) the benefit of its bargain for settlement in which Amres would avoid the JAMS proceedings in a foreign jurisdiction would be gone, and any judgment rendered would be practically final and unappealable.

44. As a matter of judicial notice, Amres is involved in litigation in State Court with its former co-owner, (K. Ayzenberg), since 2022, in Bucks County, (PA), where it procured an Order for willful contempt of Court, against him, for his failure to render significant funds to Amres, (in excess of 3 million), by failing to purchase a certain loan portfolio he was contractually obligated

to "take with him" upon his departure from Amres.[1], and 39. 39. Amres procured two expert reports where its damages are around 3.5 to 5 million. See Order for Contempt attached as **Exhibit G.**

45. As Ayzenberg was able to appeal the ruling contempt against him, the Superior Court affirmed the contempt, by an Opinion issued in December of 2024, which is now a final judgment for lack of further appeal, in (**Amres v Ayzenberg. Superior Court of PA, 2640 EDA 2023):**

> "*The record supports the trial court's conclusion that Appellant was in contempt of the consent order. Appellant had notice of the order and dates required for performance through the settlement conference; he willfully disregarded the order by refusing to consider other options that would have allowed Churchill Bank to release the original documents, and ultimately by failing to attend the required settlement conference; and he had a wrongful, or "predetermined" intention to disregard the provisions. See Gunther, supra. On this record, we see no error of law or abuse of discretion in the court's finding of Appellant's contempt. See MacDougall, supra. Appellant's third issue therefore merits no relief.*
>
> Id. p 13-14.

46. Final trial in the Bucks County matter is scheduled for November of 2025, however JAMS arbitration is scheduled for June of 2025.

47. Pursuant to JAMS and LPSA rules, in addition to $53 248.71 already paid to VPN, Amres would have to pay a sum in excess of $40,000 to merely participate in Arbitration, which together with other associated costs, Amres would not be able to do, as the damages caused by its former co-owner, as set forth above, have caused Amres to operate at or very near the break

---

[1] Kirill Ayzenberg is also the very person who, on behalf of Amres, entered into and signed VPN's LPSA agreement(s) relied on by VPN in arbitration. See Ex. E.

even point, hence the proceedings with all of its other fixed expenses would compensable by money at a later date, as the existence of such judgment would bankrupt Amres, sinking its net worth below required levels and unable to have standing in matters where it has a strong case as a Plaintiff.

48. Its due process in JAMS proceedings, with VPM, being condition by a prohibitively large payment, which can not be made, without effectively taking Amres out of business, and unable to see even its trial in Bucks county through, irreparable harm that can not be ameliorated by money, (since Amres will not be around to obtain it), will occur.

49. In weighing societal interests, and equities, if injunction was not issued, Amres would be severely punished and pushed beyond the brink of extinction, all while it has adhered to everything VPN requested, that was in its power to accomplish, while those requests that were not in its power to accomplish, (make a large sum payment to VPM), are demonstrably proven by the final State Court judgment of contempt, were not due to Amres' own wrongdoing, but that of Kirill Ayzenberg, the same person who entered in the agreement with VPM to begin with, just months before the extent of his wrongdoings was revealed, and his exit at Amres.

50. Meanwhile, VPM, should be significantly less disadvantaged, if this Court were to order the reformation of the same terms of repayment which parties had already consummated willingly during 2023 and in the first quarter of 2024, resulting in $53,248 paid off through the plan Amres is seeking to enforce herein.

**WHEREFORE** Amres prays for judgment in its favor in compensatory damages, direct, consequential, damages, and injunctive relief as set forth herein.

Respectfully Submitted By:

IFight4Justice Law Office of Predrag Filipovic, Esquire

230 S Broad Street, Floor 17, Suite 36, Philadelphia, PA 19102

(Tel) 267-265-0520; (Fax) 215-754-4190

www.ifight4justice.com; pfesq@ifight4justice.com

PA BAR ID: 312568; NJ BAR ID 029312011

Attorneys for Amres Corp.

Enclosures: Exhibits A - G